## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>UNITED STATES OF AMERICA ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EXELON CORPORATION ) <br> ) <br> and ) <br> ) <br> PUBLIC SERVICE ENTERPRISE ) <br> GROUP INCORPORATED ) <br> ) <br> Defendants. ) <br> _____) | CASE NUMBER 1:06CV01138 <br><br> JUDGE: John D. Bates <br><br> DECK TYPE: Antitrust <br><br> FILED: August 10, 2006 |

## COMPETITIVE IMPACT STATEMENT

The United States, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I.  NATURE AND PURPOSE OF THE PROCEEDING

On December 20, 2004, Defendants entered into an Agreement and Plan of Merger under which Exelon Corporation ("Exelon") would merge with Public Service Enterprise Group Incorporated ("PSEG").  On June 22, 2006, the United States filed a civil antitrust Complaint seeking to enjoin the proposed merger.  The Complaint alleges that the merger likely would

lessen competition substantially for wholesale electricity in sections of the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition would result in increased wholesale electricity prices, raising retail electricity prices for millions of residential, commercial, and industrial customers in parts of the Mid-Atlantic states.

At the same time the Complaint was filed, the United States filed a Hold Separate Stipulation and Order ("Stipulation") and proposed Final Judgment that are designed to eliminate the anticompetitive effects of the merger. Under the proposed Final Judgment, as explained more fully below, Defendants are required to divest six electric generating plants (collectively the "Divestiture Assets"). The Stipulation and proposed Final Judgment require Defendants to take certain steps to ensure that these assets are preserved and maintained and that competition is maintained during the pendency of the ordered divestiture.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations of it. Defendants have also stipulated that they will comply with the terms of the Stipulation and the proposed Final Judgment from the date of the signing of the Stipulation, pending entry of the proposed Final Judgment by the Court and the required divestiture. Should the Court decline to enter the proposed Final Judgment, Defendants have also committed to abide by its requirements and those of the Stipulation until the expiration of the time for appeal.

2

## II.  DESCRIPTION OF THE EVENTS GIVING RISE
## TO THE ALLEGED VIOLATION

### A.    The Defendants and the Proposed Transaction

Defendant Exelon is a Pennsylvania corporation, with its headquarters in Chicago, Illinois;

it owns Exelon Generation Company, LLC, which owns electric generating plants located

primarily in the Mid-Atlantic and the Midwest with a total generating capacity of more than

25,000 megawatts ("MW").  Defendant PSEG is a New Jersey corporation, with its headquarters

in Newark, New Jersey; it owns PSEG Power LLC, which owns electric generating plants

located primarily in New Jersey with a total generating capacity of more than 15,000 MW.  By

combining the generating plants owned by Exelon and PSEG, the proposed merger would

enhance the ability and incentive of the merged firm to reduce output and raise prices for

wholesale electricity in two areas of the Mid-Atlantic where Defendants are the largest generators

of electricity.  Thus, the transaction as originally proposed would lessen competition substantially

in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### B.    Wholesale Electricity in the Mid-Atlantic

Electricity supplied to retail customers is generated at electric generating plants, which

consist of one or more generating units.  An individual generating unit uses any one of several

types of generating technologies (including hydroelectric turbine, steam turbine, combustion

turbine, or combined cycle) to transform the energy in fuels or the force of flowing water into

electricity.  The generating units typically are fueled by uranium, coal, oil, or natural gas.

3

Generating units vary considerably in their operating costs, which are determined primarily by the cost of fuel and the efficiency of the unit's technology in transforming the energy in fuel into electricity. "Baseload" units – which typically include nuclear and some coal-fired steam turbine units – have relatively low operating costs. "Peaking" units – which typically include oil- and gas-fired combustion turbine units – have relatively high operating costs. "Mid-merit" units – which typically include combined cycle and some coal-fired steam turbine units – have costs lower than those of peaking units but higher than those of baseload units.

Once electricity is generated at a plant, an extensive set of interconnected high-voltage lines and equipment, known as the transmission grid, transports the electricity to lower voltage distribution lines that relay the power to homes and businesses. Transmission grid operators must closely monitor the grid to prevent too little or too much electricity from flowing over the grid, either of which might damage lines or generating units connected to the grid. To prevent such damage and to prevent widespread blackouts from disrupting electricity service, a grid operator will manage the grid to prevent any more electricity from flowing over a transmission line as that line approaches its operating limit (a "transmission constraint").

In the Mid-Atlantic, the transmission grid is overseen by PJM Interconnection, LLC ("PJM"), a private, non-profit organization whose members include transmission line owners, generation owners, distribution companies, retail customers, and wholesale and retail electricity suppliers. The transmission grid administered by PJM is the largest in the United

States, providing electricity to approximately 51 million people in an area encompassing all or

parts of New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, the District of

Columbia, North Carolina, Kentucky, Ohio, Indiana, Michigan, Tennessee, and Illinois (the

"PJM control area").

PJM oversees two auctions for the sale and purchase of wholesale electricity: a

day-ahead auction that clears the day before electricity is to be generated and delivered, and a

real-time auction that clears the day electricity is delivered.  In these auctions, generation owners

located in the PJM control area submit offers to sell electricity and electricity retailers submit

bids to purchase electricity.  Buyers submit bids that indicate the amount of electricity they are

willing to buy at different prices.  Sellers submit offers that indicate the amount of electricity they

are willing to sell at different prices.  PJM adds up the bids and offers to determine the total

demand and supply for electricity.  The amount of electricity that actually is generated and

delivered is determined by the PJM auctions.  Buyers and sellers of wholesale electricity may

also enter into contracts with each other or with third parties, outside of the PJM  auction

process; the prices of these contracts generally reflect expected auction prices.

Subject to the physical and engineering limitations of the transmission grid, PJM

seeks to have generating units operated in "merit" order, from lowest to highest offer.  In the

day-ahead auction, as long as transmission constraints are not expected, PJM takes the least

expensive offer first and then continues to accept offers to sell at progressively higher prices until

the needs for each hour of the next day are covered.  In this way, PJM minimizes the total cost of

generating electricity required for the next day.  The clearing price for any given hour essentially

is determined by the generating unit with the highest offer price that is needed for that hour, and

all sellers for that hour receive that price regardless of their offer price or their units' costs.  In the

real-time auction, which accounts for differences between anticipated and actual supply and

demand, PJM also accepts sellers' offers in merit order until there is a sufficient quantity of

electricity to meet actual demand, subject to the physical and engineering limitations of the

transmission grid.

    At times, transmission constraints prevent the generating units with the lowest

offers from meeting demand in a particular area within the PJM control area.  When that

happens, PJM often calls on more expensive units located within the smaller area bounded by the

transmission constraints (a "constrained area"), and the clearing price for the buyers in that area

adjusts accordingly.  Because more expensive units are required to meet demand, the clearing

price in a constrained area will be higher than it would be absent the transmission constraints.

    **PJM East.**  One historically constrained area within the PJM control area includes

the densely populated northern New Jersey and Philadelphia areas.  This area, referred to in the

Complaint as "PJM East," is defined by the "Eastern Interface," a set of five major transmission

lines that divides New Jersey and the Philadelphia area from the rest of the PJM control area.

When the Eastern Interface is constrained, PJM is limited in its ability to meet demand located

east of the constraint with electricity from generating units located west of the constraint.  PJM

often responds to constraints on the Eastern Interface by calling on additional generating units

east of the constraint to run, generally resulting in higher prices in PJM East than otherwise would exist because the cost of additional generation east of the constraint is higher than the cost of additional generation west of the constraint.

**PJM Central/East.**  A second constrained area in PJM includes PJM East, central Pennsylvania, and eastern Maryland.  This area is defined by two major transmission lines known as "5004" and "5005" that run from western to central Pennsylvania and divide central Pennsylvania, eastern Maryland, and PJM East ("PJM Central/East") from the rest of PJM. When the 5004 and 5005 transmission lines are constrained, PJM is limited in its ability to supply demand located east of the constraint with electricity from generating units located west of the constraint.  PJM often responds to constraints on the 5004 and 5005 lines by calling on additional generating units east of the constraint to run, generally resulting in higher prices in PJM Central/East than otherwise would exist because the cost of additional generation east of the constraint is higher than the cost of additional generation west of the constraint.

C.    <u>**Product Market**</u>

The Complaint alleges that wholesale electricity, electricity that is generated and sold for resale, is a relevant antitrust product market.  Wholesale electricity demand is a function of retail electricity demand: electricity retailers, who buy wholesale electricity to serve their customers, must provide exactly the amount of electricity their customers require.  Retail electricity consumers' demand, however, is largely insensitive to changes in retail price; thus, an increase in retail prices due to an increase in wholesale prices will have little effect on the quantity of retail

electricity demanded and little effect on the quantity of wholesale electricity demanded.  As a result, a small but significant increase in the wholesale price of electricity would not cause a significant number of retail electricity consumers to substitute other energy sources for electricity or otherwise reduce their consumption of electricity.

> **D.    Geographic Markets**

The Complaint alleges that "PJM East" and "PJM Central/East" are relevant antitrust geographic markets defined by transmission lines in the PJM control area: PJM East is defined by the Eastern Interface, and PJM Central/East is defined by the 5004 and 5005 transmission lines.  When these lines approach their operating limits, purchasers of electricity have limited ability to purchase electricity generated outside the relevant geographic market to meet their needs.  At such times, the amount of electricity that could be purchased outside PJM East or PJM Central/East is insufficient to make it unprofitable for generators located inside those areas to make a small but significant price increase.  Thus, PJM East and PJM Central/East are relevant antitrust geographic markets.

> **E.    The Competitive Effects of the Transaction on Wholesale Electricity**

The Complaint alleges that Exelon's proposed merger with PSEG would eliminate competition between them and give the merged firm the incentive and ability profitably to raise wholesale electricity prices, resulting in increased retail prices for millions of residential, commercial, and industrial customers in PJM East and PJM Central/East.  In PJM East during 2005, more than $10 billion of wholesale electricity was sold for resale to nearly 6 million retail

customers; in PJM Central/East during 2005, more than $19 billion of wholesale electricity was sold for resale to nearly 9 million retail customers. In PJM East and PJM Central/East, the merged firm would own a substantial share of total generating capacity in highly concentrated markets. More importantly, in both geographic markets the merged firm would own low-cost baseload units that provide incentive to raise prices, mid-merit units that provide incentive and ability to raise prices, and certain peaking units that provide additional ability to raise prices in times of high demand.

**Market shares in PJM East and PJM Central/East.** In PJM East, Exelon currently owns approximately 20 percent of the generating capacity and PSEG currently owns approximately 29 percent of the generating capacity. After the merger, Exelon would own approximately 49 percent of the total generating capacity in PJM East. In PJM Central/East, Exelon currently owns approximately 19 percent of the generating capacity and PSEG currently owns approximately 21 percent of the generating capacity. After the merger, Exelon would own approximately 40 percent of the total generating capacity in PJM Central/East.

**Concentration in PJM East and PJM Central/East.** The U.S. Department of Justice and the Federal Trade Commission's 1992 Horizontal Merger Guidelines consider markets in which the post-merger Herfindahl-Hirschman Index ("HHI"), a measure of concentration explained in Appendix A of the Complaint, exceeds 1800 points to be highly concentrated. Transactions that increase the HHI by more than 100 points in highly concentrated markets

presumptively raise significant antitrust concerns under the Horizontal Merger Guidelines.[1]

Exelon's merger with PSEG would yield a post-merger HHI in PJM East of approximately 2750

points, representing an increase of more than 1100 points.  Exelon's merger with PSEG would

yield a post-merger HHI in PJM Central/East of approximately 2080 points, representing an

increase of approximately 790 points.  Thus, the proposed merger raises a presumption of

significant antitrust concerns in PJM East and PJM Central/East.

> **Increased ability and incentive profitably to withhold output and raise prices.**  The
> Complaint alleges that the proposed merger would substantially lessen competition.  The
> combination of PSEG and Exelon's generating units would increase the merged firm's ability
> and incentive to withhold selected output, forcing PJM to turn to more expensive units to meet
> demand, resulting in higher clearing prices in PJM East and PJM Central/East.

Baseload units, such as nuclear steam and some hydroelectric units, typically generate

electricity around the clock during most of the year; certain lower-cost mid-merit units, including

some coal-fired steam units, generate electricity for a substantial number of hours during the

year.  When they are running, such baseload and mid-merit units are positioned to benefit from

an increase in wholesale electricity prices.  Because they run so frequently, these units provide a

relatively significant incentive to withhold output and raise prices.

---

[1] *See* U.S. Department of Justice and Federal Trade Commission, Horizontal Merger
Guidelines § 1.51 (April 2, 1992) *available at*
http://www.usdoj.gov/atr/public/guidelines/hmg.htm.

Mid-merit units also provide substantial ability to withhold output to increase the market clearing price. Mid-merit units have costs that are close to clearing prices for a substantial number of hours during the year. Because their costs are so close to clearing prices, the opportunity cost of withholding output from these units – the lost profit on the withheld output – is smaller than it would be for low-cost baseload units. This fact is also true of certain peaking units during times of the year when demand is higher.

By giving the merged firm an increased amount of baseload and mid-merit capacity, combined with an increased share of mid-merit and peaking capacity, the merger substantially increases the likelihood that Exelon would find it profitable to withhold output and raise price. With its increased share of mid-merit and peaking capacity, the merged firm would more often be able to reduce output and raise market clearing prices at relatively low cost to it. And with its increased amount of baseload and mid-merit capacity, the merger would make it more likely that the increased revenue on the merged firm's baseload and mid-merit capacity would outweigh the cost of withholding its higher-cost mid-merit and peaking capacity. Thus the merger facilitates Exelon's incentive and ability to reduce output and raise market prices.

**F.    <u>Entry</u>**

The Complaint alleges that entry through the construction of new generation or transmission capacity would not be timely, likely, and sufficient to deter or counteract an anticompetitive price increase. Given the necessary environmental, safety, and zoning approvals

required, it would take many years for such new entry to take place.  Thus, entry via new generation or transmission capacity would, at a minimum, not be timely.

### III.  EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment would preserve the competition that would have been lost in PJM East and PJM Central/East had Exelon's merger with PSEG gone forward as proposed. Within 150 days after consummation of their merger, Defendants must sell all of their rights, titles, and interests in the Divestiture Assets.  The assets and interests will be sold to purchasers acceptable to the United States in its sole discretion.  In addition, the Final Judgment prohibits the merged company from reacquiring or controlling any of the Divestiture Assets, as well as limits its ability to acquire, or enter into contracts to control, generating units in PJM East or PJM Central/East.

### A.    Divestiture

The Complaint alleges that the merger would significantly enhance the merged firm's ability and incentive profitably to reduce output and raise prices in PJM East and PJM Central/East.  The divestiture requirements of the proposed Final Judgment will maintain competition for wholesale energy in these geographic markets by allowing independent competitors to acquire the Divestiture Assets.  The Divestiture Assets are six generating plants located in PJM East and PJM Central/East that comprise mid-merit and peaking units:

 • Cromby Generating Station, 100 Cromby Rd. at Phoenixville, PA, 19460;

12

• Eddystone Generating Station, Number 1 Industrial Hwy. at Eddystone, PA, 19022;

• Hudson Generating Station, Duffield & Van Keuren Aves. at Jersey City, NJ, 07306;

• Linden Generating Station, 4001 South Wood Ave. at Linden, NJ, 07036;

• Mercer Generating Station, 2512 Lamberton Rd. at Hamilton, NJ, 08611; and

• Sewaren Generating Station, 751 Cliff Rd. at Sewaren, NJ, 07077.

The Divestiture Assets include all of the merged firm's coal-fired steam units in PJM East and PJM Central/East (located at the Eddystone, Cromby, Hudson, and Mercer plants); one of the merged firm's two combined cycle units (located at the Linden plant); and several efficient peaking units (located at the Eddystone, Cromby, Linden, Hudson, and Sewaren plants).

**Effect of divestiture on market shares and concentration.** Divestiture of these plants will reduce market shares and concentration substantially relative to what they would have been absent divestiture. Absent divestiture, the merged firm's share of capacity would be approximately 49 percent in PJM East and 40 percent in PJM Central/East. With divestiture, the merged firm's share of capacity will be approximately 32 percent in PJM East and 29 percent in PJM Central/East.

The pre-merger HHI concentration levels for PJM East and Central East are approximately 1590 points and 1290 points, respectively. Absent divestiture, the post-merger HHIs would increase to highly concentrated levels of approximately 2750 points and 2080 points, respectively. The divestiture, however, significantly reduces these levels.

13

**Effect of divestiture on ability and incentive profitably to withhold output and raise prices.**  Although the divestiture will substantially reduce market shares and concentration levels compared to the levels that would have prevailed absent divestiture, the purpose of the divestiture is to preserve competition, not merely maintain HHIs or market shares at their pre-merger levels.[2]  Accordingly, the proposed Final Judgment seeks to restore effective competition by depriving Exelon of key assets that would have made it profitable for it to withhold output and raise prices in PJM East and PJM Central/East.  Divestiture of the six generating plants deprives the merged firm of key generating plants whose output it would otherwise have had the ability profitably to withhold.  At the same time, the divestiture reduces the incentive the merged firm otherwise would have had to withhold output.  In this way, the proposed Final Judgment assures that the merger is not likely to lead to consumer harm.

The proposed Final Judgment requires divestiture of generating units that would have significantly enhanced the merged firm's ability profitably to withhold output.  These units include all of the merged firm's coal-fired steam units in PJM East and PJM Central/East (located at the Eddystone, Cromby, Hudson, and Sewaren plants); one of the merged firm's two combined cycle units (located at the Linden plant); and several efficient peaking units (located at the Eddystone, Cromby, Linden, Hudson, and Sewaren plants).  Because their operating costs are relatively close to clearing prices for a substantial number of hours during the year, the

---

[2] *Cf.* U.S. Department of Justice, Antitrust Division Policy Guide to Merger Remedies § II (October 2004), *available at* http://www.usdoj.gov/atr/public/guidelines/205108.htm ("Restoring competition requires replacing the competitive intensity lost as a result of the merger rather than focusing narrowly on returning to premerger HHI levels.").

opportunity cost of withholding output from these units – the lost profit on withheld output from them – is relatively small.  Without these units, Exelon will be left with few assets in PJM East and PJM Central/East that operate close to clearing prices for a substantial number of hours of the year.  This will increase significantly the opportunity cost of withholding output and make it less likely to be profitable.  Thus the divestiture will substantially limit the ability of the merged firm profitably to withhold output and thereby raise prices.

The divestiture will also reduce the merged firm's incentive to withhold output and raise prices.[3]  Certain of the divested assets – the  coal-fired steam and combined cycle units – have operating costs that are below the market clearing price for a substantial portion of the year and which therefore are frequently in a position to benefit from an increase in the market clearing price.  Divestiture of these units will reduce the potential gains to the merged firm of withholding output and thus reduce the incentive of the merged firm to withhold output in the first place.

**Requirements regarding divestiture.**  Defendants must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with prospective purchasers. Defendants must also provide acquirers information relating to personnel that are or have been involved, at any time since January 1, 2006, in the operation of, or provision of generation services by, the Divestiture Assets.  Defendants further must refrain from interfering with any

---

[3] Post divestiture, Exelon will retain a significant amount of low-cost, baseload nuclear capacity.  Although this capacity may provide Exelon with incentive to exercise market power by withholding output, the divestiture called for by the proposed Final Judgment substantially limits Exelon's ability to withhold output.  Moreover, it is not likely that Exelon will withhold output from nuclear units given the large opportunity cost – the lost profit on withheld nuclear output – of withholding.

negotiations by the acquirer or acquirers to employ any of the personnel that are or have been involved in the operation of any of the Divestiture Assets.  Moreover, the proposed Final Judgment restricts Defendants from reacquiring any of the Divestiture Assets during the term of the proposed Final Judgment.  Finally, the proposed Final Judgment requires that Defendants, with certain exceptions, obtain advance approval from the Department of Justice, for the entire duration of the Final Judgment, to acquire or enter into contracts to control any generating plants within the utility zones within PJM East or PJM Central/East.

### B.    Use of a Divestiture Trustee

In the event that Defendants do not accomplish the divestiture within the periods prescribed in the proposed Final Judgment, the proposed Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestiture.  If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all the costs and expenses of the trustee.  The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished.  After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture.  At the end of sixty (60) days, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

## IV.  EXPLANATION OF THE HOLD SEPARATE STIPULATION AND ORDER

The Stipulation entered into by the United States and Defendants ensures that the Divestiture assets are preserved and maintained and that competition is maintained during the pendency of the ordered divestiture.  First, the Stipulation includes terms requiring that Defendants maintain the Divestiture Assets as economically viable and competitive facilities. Second, the Stipulation includes terms ensuring that Defendants do not withhold output from the wholesale electricity market.  In particular, the Stipulation requires that Defendants offer the output from certain generating units that they continue to own after consummation for sale into the PJM auctions at no more than specified price levels until the Divestiture Assets are sold.  The Stipulation also calls for appointment of an auditor to ensure that Defendants offer their units at no more than the specified price levels and that they do not withhold the output of generating units to raise prices.  These requirements seek to ensure that Defendants will not offer their units into the PJM auctions in a way that allows Defendants to raise the market clearing price.

Requiring Defendants to hold the Divestiture Assets separate and distinct, a typical requirement in Antitrust Division hold separate stipulation and orders, would not have prevented competitive harm in the interim period from consummation to divestiture.  The operator of the Divestiture Assets would have recognized that reducing their output would increase the clearing price and benefit Defendants' remaining generating units.  Therefore, the Stipulation requires that Defendants maintain offers for output of the Divestiture Assets at the specified levels. Defendants are relieved of the requirement to offer their units at no more than specified levels if

they transfer to a third party the rights to offer and receive the revenues from the sale of the complete output of the Divestiture Assets.

## V.  REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## VI.  PROCEDURES AVAILABLE FOR MODIFICATION OF
## THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should

do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register.  All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.  The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

Donna N. Kooperstein
Chief, Transportation, Energy & Agriculture Section
Antitrust Division
United States Department of Justice
325 Seventh Street, NW, Suite 500
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VII.  ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  The United States could have continued the litigation and sought preliminary and permanent injunctions against Exelon's acquisition of certain PSEG assets.  The United States is satisfied, however, that the divestiture of assets described in the

19

proposed Final Judgment will preserve competition in the market for wholesale electricity in

PJM East and PJM Central/East.

## VIII.  STANDARD OF REVIEW UNDER THE APPA
## FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the

United States be subject to a sixty (60) day comment period, after which the Court shall

determine whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. §

16(e)(1).  In making that determination, the Court shall consider:

> (A)    the competitive impact of such judgment, including termination of alleged
> violations, provisions for enforcement and modification, duration of relief sought,
> anticipated effects of alternative remedies actually considered, whether its terms
> are ambiguous, and any other competitive considerations bearing upon the
> adequacy of such judgment that the court deems necessary to a determination of
> whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant
> market or markets, upon the public generally and individuals alleging specific
> injury from the violations set forth in the complaint including consideration of the
> public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).[4]  As the United States Court of Appeals for the District of

Columbia Circuit has held, under the APPA a court considers, among other things, the

---

[4] In 2004, Congress amended the APPA to ensure that courts take into account the above-quoted list of relevant factors when making a public interest determination.  Compare 15 U.S.C. § 16(e) (2004) with 15 U.S.C. § 16(e)(1) (2006) (substituting "shall" for "may" in directing relevant factors for court to consider and amending list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms).  This amendment does not affect the substantial precedent in this and other Circuits analyzing the scope and standard of review for Tunney Act proceedings.

relationship between the remedy secured and the specific allegations set forth in the

government's complaint, whether the decree is sufficiently clear, whether enforcement

mechanisms are sufficient, and whether the decree may positively harm third parties. *See United*

*States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

      With respect to the adequacy of the relief secured by the decree, a court may not "engage

in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS,*

*Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666

(9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed
> antitrust consent decree must be left, in the first instance, to the discretion of the
> Attorney General.  The court's role in protecting the public interest is one of
> insuring that the government has not breached its duty to the public in consenting
> to the decree.  The court is required to determine not whether a particular decree is
> the one that will best serve society, but whether the settlement is "*within the
> reaches of the public interest*."  More elaborate requirements might undermine the
> effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[5]  In making its public interest

determination, a district court must accord due respect to the government's prediction as to the

---

    [5]  *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"); *see generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

effect of proposed remedies, its perception of the market structure, and its views of the nature of the case. *United States v. Archer-Daniels-Midland Co.*, 272 F.Supp.2d 1, 6 (D.D.C. 2003).

Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F.Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60.

In its 2004 amendments to the Tunney Act, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16 (e)(2). This language codified the intent of the original 1974 statute, expressed by Senator Tunney in the legislative history: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

23

## IX.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: August 10, 2006

Respectfully submitted,

_____/s/_____
Mark J. Niefer (DC Bar #470370)
Jade Alice Eaton (DC Bar #939629)
Tracy Lynn Fisher (MN Bar #315837)

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2006, I caused a copy of the foregoing Competitive

Impact Statement to be served on counsel for Defendants in this matter in the manner set forth

below:

By electronic mail and hand delivery:

Counsel for Defendant Exelon Corporation
John M. Nannes, Esq. (DC Bar #195966)
Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates
1440 New York Ave., NW
Washington, DC 20005-2111
Tel: (202) 371-7090
Fax: (202) 661-9191


Counsel for Defendant Public Service Enterprise Group, Inc.
Douglas G. Green, Esq. (DC Bar #183343)
Steptoe & Johnson, LLP
1330 Connecticut Ave., NW
Washington, DC 20036-1795
Tel: (202) 429-6264
Fax: (202) 429-3902

_____/s/_____
Mark J. Niefer (DC Bar #470370)
Department of Justice
Antitrust Division
325 Seventh Street, NW
Suite 500
Washington, DC 20530
Tel: (202) 307-6318
Fax: (202) 307-2784